Walter R.. Hart, J.
The action herein seeks to charge defendant with moneys which were trust funds as defined by the Lien Law, alleged to have been diverted to defendant with knowledge of their trust character.
Plaintiff moves pursuant to CPLR 3211, 3212 to strike out defendant’s two affirmative defenses and for summary judgment and an assessment of counsel fees. Prom the pleadings, affidavits and exhibits submitted on the motion, the following facts appear:
On September 16, 1959 plaintiff as general contractor entered into a contract for construction on and alterations of premises of the Victory Memorial Hospital. Pursuant thereto, plaintiff executed and delivered a payment bond for $1,476,500, conditioned on the prompt payment by plaintiff of all claims for labor and material used in performance of the contract. Thereafter, on November 24, 1959, plaintiff entered into a subcontract with Raymar Contracting Corporation for certain specified work for $233,000, which was increased by extras to $247,594. Raymar performed part, but not all, of the work, and discontinued the job on or about May 5,1961, whereupon plaintiff completed the work through various other subcontractors. Prior to the termination of the work by Raymar, it is alleged that it failed to make some payments to its subcontractors for labor and material in the sum of $53,026.21. Plaintiff, being liable under its payment bond to Victory Memorial Hospital, avers that it made these payments and asserts that it is subrogated to the rights which these claimants had under the Lien Law, rights which it claims to have accrued against the defendant, a factoring corporation, by reason of a diversion of trust assets by Raymar to defendant, then known as Simpson Factor Corporation, of funds paid in varying amounts to Raymar total *551 ing $169,469.60. It is claimed that the diversion was effectuated in the following manner:
Assignments of the moneys due or to become due were executed by Bayrnar to defendant. The assignments, however, were not filed with the County Clerk as provided for by section 15 of the Lien Law (which applied to improvements commenced prior to Sept. 1, 1959 as well as to improvements commenced subsequent thereto). Nor was a “ notice of lending ” filed as required by section 73 of the Lien Law (which •is applicable to improvements commenced subsequent to Sept. 1, 1959). The nonfiling apparently was in furtherance of the “ nondisclosure ” arrangement between Bayrnar and defendant. This was accomplished by an arrangement whereby Bayrnar, upon receipt of the checks payable to its order which bore the lengend “ a/c victory memorial hospital ”, deposited them in an account with the First National City Bank. The indorsement on the checks so deposited reads as follows:
‘1 PAY TO THE ORDER OF THE FIRST NATIONAL CITY BANK OF NEW YORK THIRTY-FOURTH STREET BRANCH RAYMAR CONSTRUCTION CORP.
W 34 ”.
The checks in question amount to $169,469.60 out of a total of $179,819.60 paid by plaintiff to Bayrnar. The bank account, as indicated by the symbol “ W 34 ”, was in fact the account not of Bayrnar but of defendant for only it could draw on it. Apparently this was to circumvent the provisions of section 75 of the Lien Law (which contained the provision of subdivision (2) of section 36-d of the statute in effect prior to Sept. 1, 1959) that if trust funds are received by a subcontractor and deposited in a bank, .they shall be deposited in the name of the subcontractor. There is and can be no dispute that the funds received by Bayrnar were trust funds under the statute and that when they were turned over to defendant, the latter had knowledge of this fact.
A threshold question of law is presented by the parties. Article 3-A of the Lien Law, effective September 1, 1959, provides that it is only applicable to improvements commenced subsequent to that date while the predecessor statute was applicable to improvements commenced prior thereto. Defendant contends that even though the contracts between Victory and plaintiff, and between plaintiff and Bayrnar, were executed subsequent to September 1, 1959, that since the architect’s plans and specifications antedated that date, the improvement was com *552 menced within the meaning of the statute prior to September 1, 1959. Defendant predicates this contention on the provision of the Lien Law (§2, subd. 4) which defines the term “ improvement ” as follows: “The term ‘improvement’, when used in this chapter, includes * * * the drawing by any architect or engineer or surveyor, of any plans or specifications or survey, which are prepared for or used in connection with such improvement In my opinion, this is not conclusive of the issue as to whether the Legislature intended to have the amended article 3-A apply to circumstances such as are here present. The inclusion in the statutory definition of architects’ services in drawing plans and specifications as part of the ‘ ‘ improvement ” or “cost of improvement” (§2, subd. 5) was solely for the purpose of protecting architects and affording liens to them which remedies they lacked prior to 1916 for such services (see L. 1916, ch. 507, and note 124 to § 3 of McKinney’s Lien Law). In any event, the issue as to whether article 3-A of the Lien Law effective September 1, 1959 or the earlier applies is not determinative of this matter. Even though no “notice of lending” was filed as required by section 73 of the later article, the fact remains that no notice of assignment was filed with the County Clerk as required by section 15 of the Lien Law, which was mandated by the earlier statute and is still in effect. Therefore, if it is established as a fact that there had been a diversion of the trust funds, defendant would be required to account to the beneficiaries of the trust (American Blower Corp. v. James Talcott, Inc., 10 N Y 2d 282). Defendant contends that the failure to file the assignment with the 'County Clerk as required by section 15 did not invalidate it as to those claimants who had not filed notices of lien with the County Clerk prior thereto. This contention is completely invalid since section 36-b of the Lien Law, as amended by chapter 808 of the Laws of 1942, specifically provides: ‘ ‘ Such trust may be enforced by a civil action maintained as provided in article three-a of this chapter by any person entitled to share in the fund, whether or not he shall have filed, or had the right to file, a notice of lien or shall have recovered a judgment for a claim arising out of the improvement. For the purpose of a civil action only, the trust funds shall include the right of action upon an obligation for moneys due or to become due to a subcontractor, as well as moneys actually received by him.” (Emphasis supplied.) The authorities cited by defendant in support of its contention relate to causes of action that accrued prior to the effective date of the 1942 amendment.
*553 Defendant by its first affirmative defense alleges:
“ 7. That each time a payment was received by Raymar Contracting Corporation from the plaintiff herein, and delivered to defendant, defendant in turn delivered to Raymar Contracting Corporation a check in a similar amount for use by Raymar Contracting Corporation for the payment of labor, materials, plant, tools and equipment, and such other purposes as provided under the Lien Law of the State of New York.
“ 8. That by reason of the exchange of checks, as aforesaid, defendant at no time received any monies for its use and benefit from Raymar Contracting Corporation, which Raymar Contracting Corporation had received from the plaintiff herein.” Defendant, to establish this defense, and in support of its argument that it merely acted as a bank or depository for Raymar and that there was no diversion, sets forth as an appendix to its brief a statement showing the checks delivered by plaintiff to Raymar which were deposited in the “ W 34” bank account and the checks issued in exchange by defendant to Raymar as follows:

The court is cognizant of the fact that George Stofsky, the former vice-president and treasurer of Simpson, specifically and unequivocally testified under oath at an examination before trial that the payments received by Raymar from plaintiff and delivered to defendant were applied in reduction of Ray-mar’s general loan account and when received by defendant, additional advances were made by defendant to Raymar — that these, in effect, became merged in Raymar’s revolving credit fund (Simpson had been factoring other contract jobs for Raymar). In opposition to the motion for summary judgment, Stofsky in his affidavit states that the testimony in his examination before trial that “ remittances received from Raymar were those credited in reduction of the amount of advances *554 made by Simpson ” was the language of plaintiff’s counsel and not his. He also states in his affidavit in opposition to the motion that As the balance of the surrounding testimony shows, we were talking at that point about general procedures, not specifies.” He further swore:
“ Unquestionably, some payments received by Baymar and turned over to Defendant were at certain times credited against Outstanding advances, but the ten (10) specific checks with which we are dealing on this motion and in this action were most emphatically not so treated. As the schedule attached to Defendant’s memorandum in opposition clearly shows, and as the checks from Simpson to Baymar themselves clearly show, e;ach of the ten (10) Oaristo checks was simply exchanged for another check, at the same time, that check being either in the same amount as the Oaristo check or in a greater amount, including payment for other checks handed over at the same time.
“ At no point were the ten (10) cheeks here involved ‘ credited in reduction of the amount of advances made by Simpson.’ On the contrary, at the time these seven checks came in from Baymar, we provided him with equal sums in every instance, and at the same time. Comparison of the dates on the checks and their amounts show this quite clearly, in the majority of instances, the sums being identical and the dates being clearly contemporaneous. ’ ’
"While the affidavit as noted is in direct conflict with the testimony adduced at the examination before trial, and the explanation proffered in opposition to the motion may tax credulity, clearly the issue as to whether the witness has rehabilitated his credibility is one for the trier of the facts. The credibility of affiants on a motion for summary judgment is for the trial court (Bernstein v. Kritzer, 224 App. Div. 387; Airflow Taxi Corp. v. C. I. T. Corp., 258 App. Div. 857).
If in truth the moneys were not retained by Simpson and the latter merely acted as a depository, there was no diversion of the trust assets to it, since, if the facts are as defendant contends, there is no diversion of trust funds within the meaning of section 72 of the Lien Law, which defines a diversion as ‘ ‘ any transaction by which any trust asset is paid, transferred or applied for any purpose other than a purpose of the trust ”. Defendant’s activity as a depository or a bank would therefore not constitute a diversion.
While the issue raised by the first affirmative defense is one that could have been controverted by denial of the allegation of the diversion of the trust fund to the use and benefit of *555 defendant and defendant ordinarily may not plead as an affirmative defense anything embraced within the general issue (George v. City of New York, 42 Misc. 270; General Auto Supply Co. v. Rockwell, 162 N. Y. S. 210), it will be permitted to stand since the facts therein “ tend to clarify the issue ” (Murray Oil Prods. Co. v. Hanover Fire Ins. Co., 261 App. Div. 809; Bernstein v. Cohen, 82 N. Y. S. 2d 483).
Accordingly, the motion to strike the first affirmative defense is denied.
The theory underlying the second affirmative defense is that plaintiff, with knowledge of defendant’s financing arrangement with Baymar, did not give notice to defendant of the claims of Baymar’s subcontractors and failed to give defendant an opportunity to inquire into the validity of the claims; that due to plaintiff’s failure to notify defendant of the claims, defendant paid certain moneys to Baymar, and that therefore plaintiff is estopped from maintaining the action. Defendant argues that since plaintiff has turned to equity, he does so with “ unclean hands ”.
In opposition to the motion to strike the defense, defendant offers no facts but merely asserts that plaintiff had knowledge of defendant’s ‘‘ non-notification ’’ arrangement with Baymar ; that the account number “ W 34” appearing in the indorsement on the check was sufficient to indicate to plaintiff that .such an arrangement existed; that such knowledge comes from plaintiff’s experience with construction financing arrangements and “it is our understanding that Plaintiff had received this information from Baymar.” In any event, for what it is worth, there is to be evaluated by the trier of the facts the circumstance evidenced by the testimony of one of plaintiff’s officers upon the examination before trial that despite the fact that the contract between plaintiff and Baymar provided that prior to payments to Baymar, the latter was required to furnish an affidavit showing all unpaid obligations and indicating what were to become due, that no such affidavits were requested from Baymar at the time the payments were made.
I.t is patent that the defendant has failed to marshal facts to sustain this defense. However, since the facts with respect to plaintiff’s awareness of the arrangement and whether it acted in good faith are clearly not within the knowledge of the defendant, summary judgment or the striking of a defense may not be granted (Karpas v. Bandler, 218 App. Div. 418; Verity v. Peoples State Bank of Baldwin, 1 A D 2d 833; Be France v. Oestrike, 8 A D 2d 735; Suslensky v. Metropolitan Life Ins, Co., 180 Misc. 624, affd. 267 App. Div. 812).
*556 Yet another reason exists for the denial of plaintiff’s motion for summary judgment. The contract between plaintiff and Raymar was for a total of $247,594 for all work including extras. Raymar, according to plaintiff’s averrals, remained on the job until May 5, 1961. On April 4, 1961, Raymar wrote plaintiff stating that the cost to complete the contract would be $53,030 due to subcontractors but only when their work would be completed, at which time there would be due $77,742.25 to Raymar, including $9,570 for temporary heat maintenance not included in the contract. On this basis there would be enough to pay all claims and even leave a surplus to Raymar, yet plaintiff claims that it paid $53,026.21 to the subcontractors and materialmen for payments due from Raymar when it left the job plus $94,716.74 to complete the work. This is in addition to the $179,890.60 already paid Raymar, or a total of $327,562.55 on the contract which Raymar was to complete for $247,594. It must be remembered that plaintiff’s payments to Raymar totaling $179,890.60 were based on estimates of completion by Raymar of about $200,000 of work since, as appears from the examination before trial, 10% was retained each time a requisition for payment was honored. Raymar, in its “ requisition for payment” of December 6, 1960, claimed that $227,250 of work was completed, which would mean that very little more had to be done. Defendant should be permitted to develop its contention that there was a large enough balance due to Raymar from plaintiff to satisfy the claims of trust beneficiaries. If this is established by defendant, plaintiff would not be subrogated to the rights of the claimants.
It may be observed in passing that plaintiff is endeavoring to charge defendant with an additional sum of $94,716.74 which it is alleged it was required to expend to complete the performance of the work which Raymar contracted to do. Clearly this is not part of the trust res (Lien Law, § 70) and defendant is not liable therefor.
Another matter requiring comment in connection with the relief sought by plaintiff and for which summary judgment was sought was a request for an allowance of counsel fees to be charged against defendant on the theory, as alleged in the complaint, that this is a “ class action ’ ’. The purpose of the allegation is to come within the language of section 77 of the Lien Law that a trust arising under the statute may be enforced in a representative or class action brought for the benefit of all beneficiaries of the trust. This provision is aimed at safeguarding an equitable prorata distribution of the funds to all suppliers of material and labor who have improved the *557 real property (see 1.959 Report of N. Y. Law Rev, Comm., p. 223). However, even if the instant action were a class action, it does not follow that plaintiff would he entitled to recover counsel fees. Suffice it to say that there is no statutory authority or case law for such an allowance. Plaintiff’s reference to Matter of Schwarz v. General Aniline & Film Corp. (305 N. Y. 395) is inapposite. There the court held that the provisions of the General Corporation Law providing for reimbursement of expenses for counsel fees incurred by officers and directors of corporations were not applicable to criminal actions. It is only in certain types of specified class actions specifically provided for by various statutes that counsel fees are allowed to successful plaintiffs, and in such instances the provisions for the allowances are generally directed to be made out of the recovery and do not impose additional liability on the defendant.
Defendant’s contention, on the other hand, that the action may not be maintained by plaintiff as a subrogee is devoid of merit. Section 77 of the Lien Law (new art. 3-A) specifically authorizes the maintenance of the action by trust beneficiaries “ including any person subrogated to the right of a beneficiary of the trust holding a trust claim”. Defendant argues that the action is not maintainable by a subrogee under the former article 3-A since no provision therefor was made. The court concludes the contrary and holds that even in the absence of a statutory provision, under the principles of equity and justice such an action would be maintainable by a subrogee under the circumstances here present. As stated in Corpus Juris Secundum (vol. 83, Subrogation, p. 578): “ Subrogation does not
owe its origin to statute, custom, or the common law, but is a creature of equity”; and at page 581: “ The object of subrogation is to promote and accomplish justice and to prevent injustice.”
In fine, plaintiff’s motion is in all respects denied.